## THE INFANTA MARIA TERESA.[1]

APPEAL FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

No. 273. Argued October 27, 28, 1902.—Decided February 23, 1903.

The Spanish war vessel Infanta Maria Teresa at the engagement at Santiago on July 3, 1898, was so far sunk and destroyed that she could not be sent in for adjudication, and no survey was had nor was any sale directed by the commanding officer, nor was she taken by and appropriated for the use of the United States and the value deposited under sec. 4625, Rev. Stat. Subsequently she was raised by a wrecking company under a contract with the Government and taken as far as Guantanamo, whence, after certain temporary repairs were made, it being impossible to completely repair her at that port, she proceeded in tow and partially under her own steam to Norfolk, the nearest government navy yard and the nearest point where permanent repairs could be made. On the way she was lost at Cat

---

[1] Docket title—*United States* v. *Taylor*, originally *United States* v. *Sampson*. See 187 U. S. 436.

Island as a result of inability to withstand the storm on account of injuries received in the action at Santiago, became a total wreck, and was abandoned. The commanding officer concurred with the Government in the effort at salvage.

*Held*, that as the salvage was not actually accomplished, there was no appropriation to its use by the Government in the meaning of the statute and the captors were entitled to bounty only and not to prize money.

*Held*, that the disposition of the property taken from the vessel must follow the rule laid down in *The Manila Prize Cases, ante*, p. 254.

THIS is an appeal from a decree of the Supreme Court of the District of Columbia, sitting as a District Court of the United States in admiralty, on a libel in prize filed by William T. Sampson, Rear Admiral, United States Navy, in behalf of himself and the officers and men of the naval force on the North Atlantic Station, who took part in the naval engagement off Santiago. During the pendency of the appeal in this court Admiral Sampson died, and his death being suggested, Admiral Henry C. Taylor was substituted by direction of the court. 187 U. S. 436.

The engagement took place July 3, 1898, when the Spanish fleet, consisting of the Infanta Maria Teresa, Cristobal Colon, Viscaya, Almirante Oquendo, and the torpedo boats Furor and Pluton, which had been lying in the harbor of Santiago, made a sortie and attempted to force its way past the American fleet then blockading the port. None of the Spanish vessels were afloat at the close of the action. The least injured was the Cristobal Colon, which was sunk by her commander, and lay nearly on her beam ends. The vessel in the next best condition was the Infanta Maria Teresa, whose bottom had been pierced by a point of rock, while she was completely burned out above the protective deck. She lay nearly upright, being submerged to about her normal water line aft, and a little less than this forward.

On July 6, 1898, a board of eight officers was designated by Admiral Sampson, the commander-in-chief, to make "a thorough examination of the condition of the wrecked Spanish vessels," and to consider and report on the possibility of saving any of them. July 13, 1898, the board reported that it was "possible and desirable to float the Infanta Maria Teresa,"

and as to the Cristobal Colon, " that if the weather continues favorable the probabilities are good for saving the vessel."

July 6, 1898, a contract was entered into between the Merritt-Chapman Derrick Wrecking Company and the United States, stating in its preamble that the United States was " desirous of raising and saving as many as possible of the Spanish vessels composing the fleet of Admiral Cervera," and providing that the contractors should, upon " arriving at the scene of the wreck of the Cristobal Colon, at once begin the work of raising that vessel," with so much of her armament, stores, etc., as it might be possible to recover, the vessel and appurtenances, if so required by the United States, to be transported to the navy yard at Norfolk, Virginia. The contract further stated : " Inasmuch as it is believed that the Cristobal Colon is the least damaged of all the Spanish vessels above referred to, the party of the first part will endeavor to float her, and in case of success in that undertaking, or if it should in the judgment of the senior United States naval officer present, be impossible to save that vessel, or if in his judgment, during the work on the Cristobal Colon, it should be practicable to devote any time, attention, or labor to the saving of any of the other of the said vessels, then the party of the first part shall do all in its power towards the accomplishment of that end," etc. And further : " An officer of the Navy, to be designated by the commander-in-chief, and at all times subject to his orders, under the direction of the Secretary, shall be present at the scene of the work as the Department's representative, to supervise and inspect the operations under this contract, and the party of the first part shall subsist such officer on board its vessel during the performance of such work and until the return to the navy yard at Norfolk, if so required."

Soon after the report of the board convened by Admiral Sampson, the contractors began work on the Colon, and on July 29, 1898, a supplemental contract was made in regard to the work on that vessel. The operations were carried on for some time for the purpose of raising and floating both the Colon and the Teresa, but work on the Colon was stopped on or about August 31, 1898, and the efforts were concentrated

on the Teresa, which was finally floated September 23, and reached Guantanamo, September 24. She there received certain temporary repairs, and on October 29, 1898, started for Norfolk, Virginia, convoyed by the U. S. S. Leonidas, and in tow of the United States repair ship Vulcan, and the wrecking tug Merritt, also using her own steam as far as the condition of her engines permitted. She was in charge of the wrecking company, but an officer of the Navy had charge of the government men and employés on board, at the request of the wreck master, to assist the company in taking the ship to Norfolk. On November 1 she encountered a severe storm, and, after some hours, being apparently in a sinking condition, she was cast off, and ultimately drifted on to Cat Island, where she struck on the rocks and became a hopeless wreck. The evidence showed that her inability to withstand the storm was because of injuries sustained in action. There was no contention as to negligence, and a naval court of inquiry made findings and a report to the effect that the ship was not prematurely abandoned, and that the abandonment was in nowise due to the fault or negligence of any officer of the Navy.

July 17, 1899, libellants filed a petition in the Court of Claims for bounty under section 4635, Revised Statutes, for the destruction of the Viscaya, Oquendo, Colon, Furor and Pluton, which went to decree in their favor. 35 C. Cl. 578.

July 31, 1899, the libel in the present case was filed, setting forth that the Teresa, and all property taken from her, as well as that taken from the Colon and other sunken vessels, were prize of war, and had been appropriated to the use of the United States. The libel averred that the Teresa, " after being taken for and appropriated to the use of the United States, and while in the possession of the United States, under the control of the Secretary of the Navy, being in charge of contractors employed by him," was abandoned at sea, driven ashore, and finally abandoned, " and for that reason cannot be sent in for adjudication."

The District Court entered a decree of condemnation, July 30, 1901, to the effect that the Infanta Maria Teresa and all the property taken from her and from the other vessels were law-

ful prize of war, and directing upon the ascertainment of their value the amount should be deposited subject to the further order of the court, and that libellants were entitled to receive a moiety thereof. This appeal was then taken.

*Mr. Assistant Attorney General Hoyt* and *Mr. Special Attorney Charles C. Binney* for appellant.

*Mr. William B. King* for appellees. *Mr. William E. Harvey* and *Mr. George A. King* were with him on the brief.

*Mr. James H. Hayden* for appellees. *Mr. Joseph K. Mc-Cammon* was with him on the brief.

MR. CHIEF JUSTICE FULLER, after making the foregoing statement, delivered the opinion of the court.

After the engagement, the Teresa, as she lay shattered on the shore, was not in condition to be sent in for adjudication, and no survey and appraisement were thereupon had, nor was any sale directed by the commanding officer, as provided in section 4615, Revised Statutes; nor was the Teresa taken for and appropriated to the use of the United States and the value deposited under section 4624; nor were proceedings for adjudication commenced under section 4625, until by this libel. But the attention of the Government and of the commanding officer was directed from the first to the question of salvage. The commanding officer was of opinion that the Colon and the Teresa could both be raised and reconstructed, and the Government was desirous that this should be done if possible. The proceedings to that end were conducted in perfect good faith, and there was no suggestion that by the attempt to save these ships the Government was appropriating them or either of them to its use within the intent and meaning of the statute. The Government argues, and with great force, that the Teresa having been sunk and destroyed to such an extent that the naval force was powerless to save her by its own resources, her legal status as sunk or destroyed became fixed immediately after the engagement, and that nothing but bounty could be

recovered.   In *The Manila Prize Cases, ante,* p. 254, we ruled that this was applying too rigid a construction to the statute, and that if an enemy's vessel of war sunk in battle was subsequently raised and reconstructed by the Government, she might properly be adjudicated as prize, the result being to let in the captors for prize money after the expense and cost of reconstruction and refitting had been deducted.

But the facts in this case are wholly different.   The Teresa was raised and floated, but she was lost before she reached the Norfolk Navy Yard, which was the nearest practicable point at which she could be reconstructed.

We cannot concur in the view that the United States appropriated the Teresa to its own use within the meaning of the statute by attempting, with the advice and concurrence of the captors, to save her, or by the mere act of raising, and as soon as she floated, for that was only a step in the effort at salvage, and until salvage was accomplished, she was not appropriated to use.   And this is true of the Colon, though the effort to salve her was given up before she floated.

Libellants' counsel agree with counsel for the Government that the question of prize or no prize must be determined as of the close of the engagement on July 3, 1898, but they contend that the Teresa was not sunk or destroyed as she lay stranded on the beach, and in her then condition could have been condemned as prize; that the Secretary of the Navy, in arranging to salve her, acted voluntarily, and "without the knowledge of the captors;" and that the latter, at least, yielded to his superior authority.

The statute makes no provision for adjudicating wrecks as prize.   By section 4625 proceedings may be had in respect of proceeds of property appraised and sold; in respect of the value of property appropriated to use; and in respect of property entirely lost or destroyed.

In this case there was no appraisal and sale; there was no appropriation to the use of the Government in the meaning of the statute; the vessel had not been in condition to be sent in and then been "entirely lost or destroyed."

And it must be remembered that the Teresa could never

have been raised and saved by the captors alone. Yet her salvability seems to have been generally conceded. The commanding officer took no measures to have the wreck appraised and sold, but concurred with the Government in the effort at salvage. In doing so he represented all who would have been interested if the ship had been saved, and while the chance of obtaining considerable prize money was quite good, no risk was run of losing bounty by taking that chance.

The Government acted with due prudence in employing persons, whose business it was to do such work, to raise and deliver the vessel at the Norfolk Navy Yard. If no attempt had been made, the vessel would finally have gone to pieces where she lay.

Salvors are not held responsible for a loss when attempting salvage in good faith, and with reasonable judgment and skill, *The Laura*, 14 Wall. 336, and we know of no reason why the Government should be held to a more rigorous accountability even if it could in any case be regarded from the standpoint of a mere salvor of the property of another.

Where a hostile vessel of war has been so far destroyed that she cannot be brought in by the naval force, which reduced her to that condition, but she is raised, reconstructed and appropriated to use by the Government, the statute may be so construed as to permit the application of the doctrine of relation, but this case does not come within that view, and the claim for prize money in respect of the wreck itself is not sanctioned by the act of Congress. But libellants did not waive their right to bounty by seeking to recover prize money, and to bounty they are still entitled.

As to the property taken from the Teresa and the other wrecks, its disposition must follow the rule laid down in *The Manila Prize Cases*, ante, p. 254.

In our opinion the words "ship or vessel of war belonging to an enemy," as employed in § 4635, covered armament, outfit, and appurtenances, including provisions, money to pay the crew or for necessary expenditures, everything necessary to be used for the purposes of the vessel, and as a vessel of war.

The grant of prize money and the grant of bounty were dis-

tinct grants, and the applicable general rule ought not to be deprived of its force by particular exceptions.

*The decree is reversed, without costs in this court, and the cause remanded with a direction to dismiss the libel.*

MR. JUSTICE BROWN, with whom was MR. JUSTICE BREWER, dissenting.

I am unable to distinguish this case in principle from that of the *The Manila Prize Cases, ante,* p. 254, just decided. There the vessels were sunk and partially destroyed, but were subsequently raised, hauled into the slip, sufficiently cleaned up and overhauled to put to sea for Hong Kong under their own steam. · The repairs were completed at Hong Kong, and the vessels commissioned as a part of the Navy.

In the present case, the Infanta Maria Teresa was also sunk and partially destroyed, but was raised, taken to Guantanamo, temporarily repaired, a crew put on board, was started for a port in the United States under her own steam, and was subsequently lost in a gale of wind. All the operations connected with her raising and repair were conducted by contractors engaged by the Navy Department, and supervised by a board of that department.

I submit that the fact that the vessels in Manila Bay were actually repaired and commissioned as vessels of the Navy and the Infanta Maria Teresa does not constitute a distinction in principle between the two cases; but the fact that in both cases the government elected to take possession of the vessels, and undertook to repair them for purposes of its own, is the turning point in the case. Had the vessels in Manila Bay been abandoned after being raised, and before they were repaired temporarily, had the Infanta Maria Teresa been either abandoned or lost before reaching Guantanamo Bay, or had she been there abandoned, I should have had no doubt that they could not either of them be considered as prizes of war. But the fact that, after being examined, the Maria Teresa was temporarily repaired at Guantanamo and sent to Norfolk, with a crew on board and under her own steam, indicates clearly to my

mind that the government had elected to make the vessel its own property, and her subsequent loss was the loss of the government and not of the captors.   In fact, it is the election, and not the result of the election, which determines the ownership of the property.