UNITED STATES of America, Appellant,

v.

Geraldine GAVAGAN, as Administratrix of the Estate of John Gordon Gavagan, Deceased, et al., Appellees.

No. 18094.

United States Court of Appeals
Fifth Circuit.
July 22, 1960.

---

David L. Rose, Alan S. Rosenthal, Attys., Dept. of Justice, Washington, D. C., Edith House, Asst. U. S. Atty., Jacksonville, Fla., George Cochran Doub, Asst. Atty. Gen., E. Coleman Madsen, U. S. Atty., Miami, Fla., for appellant.

Chester Bedell, Jack F. Wayman, Jacksonville, Fla., for appellees.

Before RIVES, Chief Judge, and CAMERON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

█ This appeal concerns the Government's liability under the Federal Tort Claims Act[1] for death resulting from the manner in which the Government undertook the unsuccessful rescue of the shrimper Donald Ray and her crew off the Florida Coast. As the asserted tort was a maritime one occurring more than a marine league from shore, the applicable remedy for the wrongful death is the Death on the High Seas Act, 46 U.S.C.A. § 761.[2] The District Court after an extended trial on a record which comprises 1294 printed pages plus extensive exhibits, allowed recovery. The Government appeals.

I.

The Government in its approach persists in compressing this into the mold of private salvage at sea, so that it is a case of maritime salvage, neither more nor less. This note is the opening theme of its brief. "This case is the first one in which a district court has held the United States liable for the *failure* of its employees *to reach a vessel in distress in time* to save her crew. Indeed, * * * this case is the first in which *any* person has been held liable merely *for failing to arrive* at the scene of a vessel marooned in a storm *in time to rescue* her crew." (Emphasis supplied).

This implies that the attempted rescue failed because of negligent acts of those in command of the two Coast Guard vessels, the CG 83[3] and the Buoy Tender Sweetgum, and that liability was imposed because one or both of these vessels made mistakes in the execution of the attempted salvage. This is far from the case. It is true, of course, that the CG 83, disabled, had withdrawn from the operation hours before and the Sweetgum was 30 miles, and three hours away. But the neglect was not in the failure of these two ships "to reach a vessel in distress in time." The neglect was that of persons ashore who were directing the whole operation. By 4:17 p. m. the Donald Ray was positively spotted by a National Search and Rescue plane at a position 18 miles off the coast. For over

---

[1] The Federal Tort Claims Act, 28 U.S. C.A. § 1346(b) (1959 Supp.) provides: "Subject to the provisions of chapter 171 of this title, the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States * * * for * * * personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government * * * under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

28 U.S.C.A. § 2674 provides that the assumed liability is only "in the same manner and to the same extent as a private individual under like circumstances."

[2] Hess v. United States, 1960, 361 U.S. 314, 316, 80 S.Ct. 341, 4 L.Ed.2d 305; Noel v. Linea Aeropostal Venezolana, 2 Cir., 1957, 247 F.2d 677, 66 A.L.R.2d 997, certiorari denied 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262; Higa v. Transocean Airlines, 9 Cir., 1955, 230 F.2d 780.

[3] Its number was CG 83463.

three hours this plane kept in continuous direct visual contact with the Donald Ray orbitting around her to guide surface or air units to the stricken vessel who, like the ninetieth and nine, while lost was now found. By a series of almost incomprehensible—and certainly tragic—mistakes of those ashore, and none of a kind requiring hard choices under the pressure of competing perils *in extremis*, the Donald Ray and her crew slipped off into the briny deep.

## II.

Although to suggest it is perhaps to precipitate a renewal by the Government of the contention so far unsuccessful that the Federal Tort Claims Act imposes no liability for uniquely governmental activities,[4] the fact is that this rescue project bore only limited resemblance to traditional salvage at sea. It was uniquely governmental, certainly in the sense of its size and organization. Few, if any, private concerns could mount such a vast undertaking.[5]

This activity was pursuant to the National Search and Rescue Plan (SAR) which had been promulgated in March 1956 by the President's Air Coordinating Committee [6] pursuant to the specific Recommendation No. 2 of the Civil Air Policy of May 1954.[7] It established three SAR Regions: (1) inland, (2) maritime, (3) overseas. The Air Force was designated as Regional SAR Coordinator for (1) inland region and the Coast Guard for the (2) maritime region. Within the organization of the Coast Guard the Commander, 7th Coast Guard District was responsible for the waters off Florida. The Plan called for the making of interservice agreements by the Regional SAR Coordinator (here Coast Guard) with the Armed Forces and governmental agencies. The purpose of such agreements was "to organize existing agencies and their facilities * * * in a basic network for rendering assistance both to military and non-military persons and property in distress * * * " and to "provide for the fullest practicable utilization of the facilities of such agencies in regional SAR missions under the Regional SAR Coordinator * * *." For delegation of the authority and responsibility of the Regional SAR Coordinator in territorial subdivisions, the Plan called for the establishment of an appropriate Rescue Coordination Center (RCC). The RCC had the immediate responsibility to "coordinate and, as appropriate, direct the operations of SAR facilities committed to any SAR mission * * *."

To achieve the broad humane objective of this Plan [8] it was perfectly natural that the Coast Guard was named as the Regional SAR Coordinator for the maritime region. Such responsibilities are within those long imposed upon the Coast Guard and now covered by statute which provides that the Coast Guard "may render aid to persons and protect and save property at any time and at any place

4. Indian Towing Company v. United States, 1955, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48; Rayonier, Inc. v. United States, 1957, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354.

5. The Government offered and the District Court admitted, although with evident doubt as to its probative value, uncontradicted evidence that the search for this little shrimper cost the Coast Guard nearly $70,000 and the Naval Air Force $30,000.

6. The Committee comprised the Secretaries of the Treasury, Defense, and Commerce Departments and the Chairman of the Federal Communications Commission and Civil Aeronautics Board, each of whom personally signed the Plan.

7. The Civil Air Policy, May 1954, page 44:
 "To provide an over-all Search and Rescue Plan for effective utilization of all available facilities to include provisions for the control and coordination of all types of Search and Rescue."

8. The Plan states: "3. *Objective.* To establish a National Search and Rescue Plan which will integrate into a cooperative network available U. S. SAR facilities which will be coordinated in any one area by a single federal agency in order to afford greater protection of life and property of citizens of the United States and insure greater efficiency and economy. * * *."

at which Coast Guard facilities and personnel are available and can be effectively utilized." [9]

Operation of this Plan under the organic responsibility of the District Commander was committed to the Rescue Coordination Center (RCC) at Miami. RCC was responsible for the coordination of all units being used in any Search and Rescue operation in waters off the Florida Coast. In immediate charge of RCC was the Controller, here a Commissioned Coast Guard officer. For this operation RCC had effective supervisory command over these agencies and facilities: the Captain of the Port at Jacksonville (COP–Jax); Coast Guard radio station at Jacksonville (CG RAD–Jax); the Coast Guard vessels CG 83 and Sweetgum; [10] and the SAR Unit of the Naval Air Station at Jacksonville (NAS–Jax). The planes (and crews) supplied by NAS–Jax were the amphibian Dumbo I, a helicopter and Cardfile I. Of course, the whole system, as in any organization, depended on communication [11] for the effective transmission and evaluation of data to permit timely decisions to meet changing conditions.

### III.

We shall not undertake to discuss much of the evidence showing how this complex administrative machine operated. The tragedy in mistake in lives lost is heightened by the fact that the system operated so well down to the very point where success was within reach. At that time it broke down, not because of tempestuous weather or perils of an angry cruel sea, but through those simple human errors that make us all fallible.

The Donald Ray, a 55-foot shrimper operating out of Mayport, a small fishing village at the mouth of St. John's River, left Mayport early March 7, 1957, for the fishing grounds ESE of Jacksonville. Other fishing vessels expected to follow her early on March 8. During the night of March 7–early March 8, the weather kicked up and small craft warnings were hoisted. The other vessels cancelled departures and they expected the Donald Ray to return to port. When the Donald Ray did not return all became greatly concerned. The village had the common bond of fishermen and anxiety traveled fast. One of the fishermen called COP–Jax to report the Donald Ray overdue. Before COP–Jax could compose a message for teletype to RCC at Miami one of the fishing vessels still in Mayport contacted the Donald Ray by radio. The report passed on immediately to the Coast Guard was frightening. The Donald Ray reported that she was in sinking condition, had no lifeboat or liferaft aboard, and was in need of immediate help. She reported that she had run out $4\frac{1}{2}$ hours ESE and was then in 19 fathoms. Her engines were still operating which enabled the crew to hold the boat into the wind to try to work her into the beach. But the outlook was not bright since water was then up on the engine halfway to the clutch, the pumps had stopped, and they were bailing with

9. 14 U.S.C.A. § 88 provides: "(a) In order to render aid to distressed persons, vessels, and aircraft on the high seas and on waters over which the United States has jurisdiction and in order to render aid to persons and property imperiled by flood, the Coast Guard may: (1) perform any and all acts necessary to rescue and aid persons and protect and save property; * * *.
"(b) The Coast Guard may render aid to persons and protect and save property at any time and at any place at which Coast Guard facilities and personnel are available and can be effectively utilized."

10. The Plan permits the designation of an on-the-scene-commander. The Captain of the SWEETGUM was so named, but with respect to the critical actions here involved, he exercised no command responsibility, actual or implied.

11. Communication between these elements was as follows: RCC and NAS-Jax by "Hot" Telephone Line; RCC and CG RAD-Jax by teletype; RCC and CG vessels by CG RAD-Jax; RCC and NAS-Jax Planes primarily through NAS-Jax "Hot" telephone lines although some messages went direct from NAS-Jax Planes to CG RAD-Jax for relay by teleptype to RCC.

buckets. COP–Jax teletyped this information to RCC.

Established for just such emergencies, the rescue machinery under RCC worked quickly. Within approximately a half an hour the CG 83 and the Sweetgum, dispatched by RCC, were on their way. At 9:32 a. m. RCC ordered CG RAD–Jax to broadcast and repeat in fifteen minutes an all ships emergency. When fishermen from still another vessel again contacted the Donald Ray the fathoms were put at 16. This information as well as the correction to 45 miles ESE was passed on to COP–Jax. It would take the Sweetgum nearly three hours to reach the position first given (30 miles ESE Jacksonville bar) and over four hours to reach the point 45 miles ESE Jacksonville bar. In the meantime at the request of RCC the amphibian Dumbo I together with a helicopter were assigned by NAS–Jax. Aerial reconnaissance by standard search patterns in the reported vicinity (45 miles ESE) was negative and the plane returned to her Jacksonville base for refueling about 2:30 p. m. Neither CG 83, Sweetgum, nor the planes had been informed by RCC that the Donald Ray's engines were working and she was trying to get in toward shore. In the meantime, CG 83 had sustained heavy weather damage and she retired. The Sweetgum continued her search in an area as far out as 55 miles.[12]

Then the miracle happened, or nearly did. Dumbo I resuming search flew directly east from her base at Jacksonville. At 4:14 p. m. the plane sighted a vessel. After two passes the Dumbo I positively identified the ship as the Donald Ray. This fact and her position 18 miles off the Coast bearing 90 degrees were immediately reported by radio. Both CG RAD–Jax and NAS–Jax received this message. This position and that subsequently reported by Dumbo I at 4:41 p. m. as 81.5 W 30.7 N, 15 miles off Fleming Island fan marker, was approximately 30 miles SSE off Jacksonville Bar.

Here then occurred the error which had such decisive consequence both in the decisions and actions by RCC and in the ultimate failure of the rescue. The story is told in this recorded transmission as NAS–Jax relayed to RCC the message from Dumbo I:

"* * * Dumbo * * * confirmed * * * they have sighted and identified the craft in question and he has now located it dead in the water with no apparent trouble other than being dead in the water 18 miles east of the coastline on a line directly due east of Fleming Island, they are homing overhead and will remain overhead to act as a homer for a Coast Guard ship which is approaching at this time. * *"

To this RCC stated it had received "that information from" CG RAD–Jax and then added, "I would assume that is the Coast Guard Sweetgum. Do you know any information on that?" But having asked, RCC paid no heed for NAS–Jax immediately replied, "I questioned that and they said it was not the Sweetgum."

Dumbo I actually thought it saw a vessel approaching the Donald Ray. But within five minutes Dumbo I realized that the "vessel" was an illusion from whitecaps on the sea. Dumbo I immediately reported this to NAS–Jax. Unfortunately, the first, and understandable, mistake in observation is now compounded by a second one far more serious. For NAS–Jax simply forgot to make the correction to RCC. This had decisive significance as the full reading of the RCC Controller's testimony revealed. Especially is this so in connection with the commercial tanker the SS Henry M. Dawes, then actually within five miles of the position of the Donald Ray and later, but too much later, diverted for the search.

12. Hotly contested below but immaterial to our disposition was the question whether the Sweetgum paid proper heed to the subsequent report that the Donald Ray was in 16 fathoms. The search area of the Sweetgum was in 21–25 fathoms.

RCC continued on in the belief that a vessel, probably the Sweetgum, was approaching. How RCC could do so would defy explanation save that now RCC added to that of NAS–Jax an error of its own. Within less than an hour (at 5:10 p. m.), RCC received an estimated time of arrival (ETA) of the Sweetgum at the reported position of the Donald Ray. She was due at 9:00 p. m. But this seemed to have little effect. About this same time (5:36 p. m.) Dumbo I reported a "large ship about 5 miles heading south from Fishing Vessel * * *." Dumbo I was afraid to leave her orbit over the Donald Ray to ascertain the name of the vessel. When so advised CG RAD–Jax stated they would make every effort to contact the vessel. It is uncontradicted that—as both CG RAD–Jax and RCC knew—the SS Henry Dawes was guarding Channel 500 Kcy and by an auto-alarm a message "to all ships" would have raised her. But before CG RAD–Jax could send an all ships emergency they had to have authority from RCC, as RCC knew. The RCC Controller was hard pressed under cross examination to justify his decision not to obtain immediate contact with the known but unidentified merchantman through an all ships broadcast. Though it did not improve in plausibility by reiteration, he justified it repeatedly on the ground that it was not necessary since it was known that a vessel was approaching the Donald Ray. This referred back, of course, to the erroneous but uncorrected report of Dumbo I.

We are not here dealing with knowledge acquired by hindsight. The SS Henry M. Dawes was known to be there. And RCC had every reason to expect that, as she later did, the Henry Dawes would readily join in the search if asked. But still acting on erroneous information not corrected by NAS–Jax, and ignoring as well the certainty that the vessel thought to be "approaching" the Donald Ray could not possibly be the Sweetgum, RCC did nothing. Dumbo I, however, was more resourceful. Dumbo I found another naval training airplane who circled the Henry Dawes, alerted her attention, obtained her name and almost immediately CG RAD–Jax sent a message on 500 Kcy requesting assistance. But precious time had been lost for it was now 6:20 p. m. Unfortunately, the Henry M. Dawes, steaming at 15 knots was at least 13 miles south of Donald Ray's position. By the time she turned about proceeded on a reverse course for some time and corrected it to two more easterly positions given through CG RAD–Jax, darkness had closed in and neither the Henry M. Dawes nor Cardfile I could locate the Donald Ray.

It completes the story to say that RCC knew that the Sweetgum, like the CG 83, was effectually out of the project. With the Sweetgum heading toward the reported position of Donald Ray with an ETA of 9:00 p. m., not a single decision made by RCC from about 4:30 p. m. to 7:00 p. m. could have counted on her assistance in these critical daylight hours. Actually on her way the Sweetgum took the derelict sailing sloup Windsong in tow shortly after 9:00 p. m. and headed for Jacksonville bar.

Thus we see that the critical mistakes were made, not by men taking great personal risk in heroic salvage service under trying conditions, but by those ashore in the failure to pass on and evaluate vital information.[13]

13. We agree with the District Court that the report by Dumbo I that the Donald Ray was "dead in the water with no apparent trouble" was grossly incorrect. Her freeboard then was 12 to 18 inches in contrast to the usual 5 to 6 feet. But in legal terms the neglect was again that of RCC since it could not credit any such report in the light of prior information directly from the Donald Ray, the increasing mountainous seas and high winds with the vessel dead in the water without power. Indeed, even those on the Dumbo I knew and reported as much. Assenting to CG RAD-Jax's inquiry "then he is not in immediate danger?" Dumbo I made an important qualification, "it appears that way but they do need help."

## IV.

■ The Government's frontal attack is twofold. First, it insists, this was but salvage at sea, and under maritime law a salvor, even though guilty of ordinary negligence, is not liable for damage which is not "independent" or "distinguishable." That being so, there is no liability under the Tort Claims Act since the Government's liability is only that of a private person. Second; even under the Good Samaritan Doctrine, there is no liability since this series of errors did not "worsen" the predicament of those on the Donald Ray.

The theory presumably behind the asserted rule concerning non-distinguishable damage is that apprehension of liability for damages for unsuccessful ("negligent") rescue will deter those who might otherwise volunteer. A part of this approach is that the policy underlying maritime salvage is a liberal reward to encourage such humane pursuits. In

a conceptual way the principle of non-liability is occasionally justified on the ground that the salvor has the unqualified and absolute right to abandon his efforts at any time prior to the moment he takes the property in his charge.[14]

■ These highlights emphasize the contrast with the situation posed by this record. First, imposition of liability, i. e., a duty, will not deter performance of like search and rescue projects by the Government. The Government's vast machinery is put into operation, not out of any hope of reward,[15] but out of a policy determination on the highest executive level that the resources of governmental agencies should be exploited effectively to save life and property. Second, the only expressed limitation in the National SAR Plan is that cooperation by the Armed Services is not to interfere with the performance of their military missions. Except for that, there was no absolute right in any of the

14. The Government stresses the usual cases: The Laura (Norcross v. The Laura), 1872, 14 Wall..336, 81 U.S. 336, 20 L.Ed. 813; United States v. Taylor, 1903, 188 U.S. 283, 23 S.Ct. 412, 47 L. Ed. 477; Dorrington v. City of Detroit, 6 Cir., 1915, 223 F. 232; The S.C. Schenk, 6 Cir., 1907, 158 F. 54; The Henry Steers, Jr., D.C.E.D.N.Y.1901, 110 F. 578; Lacey v. United States, D. C.D.Mass.1951, 98 F.Supp. 219, 1951 A. M.C. 1657; Page v. United States, D.C. E.D.La.1952, 105 F.Supp. 99, 1952 A.M. C. 893; The Daniel Kern, D.C.W.D. Wash.1928, 27 F.2d 920; Frank v. United States, 3 Cir., 1957, 250 F.2d 178, certiorari denied 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1069.

Of course, note must be taken of P. Dougherty Co. v. United States, 3 Cir., 1953, 207 F.2d 626, 1953 A.M.C. 1541, certiorari denied 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1068. The Government virtually concedes, as it must, that the major thesis of the Third Circuit—non-liability because of some omnipresent policy—is untenable under Rayonier, Inc. v. United States, 1957, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354. The dissenting opinion of Chief Judge Biggs, characterized properly by the Government's brief as "an exhaustive and penetrating analysis," spares us the necessity of discussing these cases in detail. We would

only say that this reveals just how little in the way of actual precedent is there to support some rather extravagant statements of the so-called general rule. And see generally Norris, the Law of Salvage (1958) pages 205–212.

15. Members of the Coast Guard, duty bound to perform salvage services under orders may not recover salvage. Norris, The Law of Salvage (1958) 90, 126–128. Navy personnel in the ordinary salvage situation are eligible and, with the consent of the Secretary of the Navy, may assert and litigate claims for salvage. Norris, supra, at 128–132. We need not determine it here, but we entertain doubt that there can be any valid distinction between Coast Guard and other governmental personnel who are jointly engaged on a rescue project pursuant to the NAS Plan. The Government undoubtedly has the right to claim and recover a salvage award for services of its vessels, merchant or public. Norris, supra, at 330. It is seldom, if ever, invoked because of the public service nature of this activity. Any hope of reward was certainly non-existent here. With expenditures of $100,000 (see note 5, supra) and a small shrimp vessel having but a fraction of that value if saved, the driving motive was the governmental policy to save life.

participants to abandon or withdraw from this rescue project. The National SAR Plan subjected all participants to Coast Guard command and through it to immediate direction by RCC at Miami. Added to that is the traditional statutory function of the Coast Guard, note 9, supra. The Government's contention is that while these duties assuredly were imposed on the officers and men of these units and as a matter of internal discipline they had no discretion to decide that they wanted no further part in this search, this concerned solely the relationship between the Government and its employees (civil or military). We may assume that non-performance by a government employee of an intra-governmental duty does not give rise to a civil right in the citizen adversely affected. But the fact remains that, on the analogy of private maritime salvage, these government employees had no right, either absolute or qualified, to abandon or withdraw. On the contrary they were bound to continue at least until in the good faith judgment of those in command, the interest of the Government required termination.[16]

If, despite the clear teaching of Indian Towing Company v. United States, supra, we must analogize to find some private activity just *like* this, the situation is more comparable to that of professional salvors operating under contract without regard to success or failure. In that situation the salvor is to be held to the performance of his undertaking,[17] and such a contract extinguishes all rights to the maritime lien and admiralty remedies open to the usual salvor.[18]

Indian Towing Company v. United States, supra, made clear that in the construction of the Tort Claims Act the vicarious liability was not to be measured by that of a private person "under the *same* circumstances." Rather, the Court pointed out, "the statutory language is 'under *like* circumstances * * *'" (emphasis supplied), 350 U.S. 61, at page 64, 76 S.Ct. 122, at page 124, 100 L.Ed. 48, at page 53. As our discussion has shown, what was undertaken here resembled private marine salvage in many ways. But it was something much more indeed. The Government may not escape liability because we cannot find any private person either who had done so or might undertake such a vast project for search and rescue. The Supreme Court rejected the argument that the Tort Claims Act "must be read as excluding liability in the performance of activities which private persons do not perform" with the consequence that "there would be no liability for negligent performance of 'uniquely governmental functions.'" 350 U.S. 61, at page 64, 76 S.Ct. 122, at page 124, 100 L.Ed. 48, at page 53. This was reiterated most positively in Rayonier, Inc. v. United States, supra. Of course, to the extent that the activity is the same as that normally done by private persons the law (here the maritime law on salvage) would control. To the extent, however, that it is different then the case does not fail because of a void in the legal precedents. The court trying the case has the obligation to determine on appropriate standards what the law would be were there such a private person performing the unusual function. The Supreme Court expressed it this way. "The broad and just purpose which the statute was designed to effect was to compensate the victims of negligence in the conduct of

16. No such thing may be contended here. On the contrary, the search went on for three more days during which much additional equipment was deployed.

17. See Norris, supra, at 290. The maritime law generally reads into contracts the duty to perform in a workmanlike manner. See, e.g., Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491; Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; S. G. Kolius & Owen Cecil, "Indemnity Suits By Vessel Owner Against Stevedoring Contractor: A Search for the Limits of the Ryan Doctrine." 27 INS. COUNSEL J. 282 (1960).

18. See Norris, supra, at 260–266.

governmental activities in circumstances *like unto those* in which a private person would be liable \* \* \*." 350 U.S. 61, at page 68, 76 S.Ct. 122, at page 126, 100 L.Ed. 48, at pages 55–56. That leads us then to the time-honored capacity of the federal judiciary in the realm of maritime law to fashion and mold its substantive as well as procedural aspects. Hess v. United States, supra.

Since it is characteristic of the maritime law generally to apply the standard of reasonable care to nearly every situation, disdaining as it often does the fine spun distinctions indigenous to the common law, Kermarec v. Compagnie Generale Transatlantique, 1959, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550, such a standard would surely be found appropriate here. Lest this be thought to disturb the jurisprudence on the run-of-the-mill private salvage problems we need to emphasize again the unique distinctions of this case. No negligent error is found with respect to vessels undertaking the rescue service. The mistakes were of those ashore. At the time these critical decisive mistakes were made the rescue efforts were still underway and they were not abandoned until days thereafter. All of the personnel and equipment deployed in this coordinated effort were there, not through a voluntary impulse to save, but by virtue of a positive duty to carry out the decisions of RCC in accordance with the National SAR Plan.

The discretionary nature of the decision to undertake the rescue at the outset or the discretionary right to abandon—which was never exercised—does not alter the duty owing by those ashore and in command during the time the operation went on. In this respect it is virtually the same as Indian Towing. "The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light \* \* \* and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable, under the Tort Claims Act," 350 U.S. 61, at page 69, 76 S.Ct. 122, at page 126, 100 L.Ed. 48, at page 56.[19]

■ In addition we are also of the opinion that the facts fully meet the requirements of the Good Samaritan doctrine. See United States v. Lawter, 5 Cir., 1955, 219 F.2d 559, at page 562; and 38 Am.Jur. "Negligence," § 17; Restatement, Torts, §§ 324, 323. The only element of any doubt is that of "worsening" the plight of the crew members of the Donald Ray. We think that adequately established. The members of the families of the crew of the Donald Ray and more especially their close friends among the fishermen on the other fishing vessels in Mayport were greatly exercised. They were maintaining a very close contact with the Coast Guard. The Coast Guard was likewise anxious to keep in contact with them. Had these persons known the true facts, steps could have been taken to reach the Donald Ray in the time remaining up to 7:00 p. m. when darkness set in and visual contact was lost. As we pointed out, the SS Henry M. Dawes was in the vicinity—not over 5 or 6 miles and 30 minutes away—and ready at the first request to respond to a search. And the other fishing vessels in Mayport were available to go out as one did later that night and as several did during the succeeding days.

All of these interested persons were standing by, as they properly might, while the extensive, experienced facilities of the Coast Guard-directed search

19. United States v. Reid, 5 Cir., 1958, 251 F.2d 691; Fair v. United States, 5 Cir., 1956, 234 F.2d 288; Eastern Air Lines v. Union Trust Co., 1955, 95 U.S. App.D.C. 189, 221 F.2d 62; Canadian Aviator v. United States, 1945, 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901.

went on. But they were ignorant of several critical facts: first, actually there was no Coast Guard vessel within reach of the Donald Ray though they understood that both the CG 83 and the Sweetgum would be; second, RCC was mistakenly assuming that an "approaching" Coast Guard vessel would soon reach the derelict and consequently RCC did not think it necessary to summon other help. Ignorance of these facts and continued reliance upon the Coast Guard's celebrated skill made independent action unnecessary. But it reasonably kept them from taking action which, in all probability, would have been successful.[20]

### V.

■ The Government also contends that the evidence was insufficient to support the findings of negligence. It further asserts that the crew members of the Donald Ray were guilty of such glaring contributory negligence that the matter should be remanded for suitable apportionment (and reduction of damages) under the maritime doctrine of comparative fault.

■ We need not discuss the first any further. It is difficult to consider the second seriously. Obviously, the prior conduct of the Donald Ray in going out, or in remaining at sea unaware of the small craft radio warnings, cannot be a defense to a failure to exercise due care in the rescue of such persons after the danger developed. The balance of the contention consists of assertions that the Donald Ray should have radioed for help, should have broadcast an SOS or a May Day distress call and the crew members of the Donald Ray should have used some of the conventional or make-shift signals generally employed at sea to indicate distress. These, a witness described, would be a smoke signal, red flag from the mast, inverted ensign, and the like. If those on the Donald Ray were not in danger of the loss of their very lives one wonders why responsible officers of the Government were spending $100,000 in the earnest effort to rescue them. It is one thing to suggest that the pilot of the Dumbo I—a flier but not a sailor—might have been justified in his report that the Donald Ray "was not in danger." But not a single responsible seafaring officer undertook to testify that a little shrimper dead in the water without power, wallowing in the troughs of mountainous seas under winds then exceeding 50 knots and expected to go higher was not in the very shadow of death.

RCC needed no signal of distress. RCC knew it had lives to save from great and imminent peril. RCC did not need more information. All it needed was to heed what it had.

### VI.

The Government objects to the admission of two small pieces of evidence.

■ The first concerns Captain Bryant's testimony. After the admitted radio conversation from his vessel, Deepwater II, about 11:00 a. m., he and Adkins went ashore to report this fact to the Coast Guard since they could not raise the Coast Guard by ship-to-shore radio. Adkins placed the call and Bryant repeated what he heard Adkins tell the person he addressed as the Coast Guard. This was not hearsay. The fact being proved was the conversation—that

20. The record shows that the Coast Guard was in constant contact with the fishermen in Mayport, and vice versa. The whole community of Jacksonville was aroused. The reported danger to the Donald Ray and the rescue was the subject of great interest by radio, television and newspaper media. COP-Jax was in touch with them and had, he testified, probably told them the names of the vessels engaged. The transcription of the "hot" line telephone messages from NAS-Jax to RCC reflect that kinswomen were calling NAS-Jax frantically to find out what was being done. In one message NAS-Jax related a report that the women were getting an airplane to send out. And, of course, the word soon traveled fast when Dumbo I located the Donald Ray and had her under contact for nearly three hours.

is, what was stated in the conversation, not the truth of it.

 The other concerned testimony of S. C. Powell, an operator of a drugstore in Mayport which was a sort of village center of communications. He testified that between 3:00 p. m. and 5:00 p. m. he answered the phone and a person identified himself as with the Coast Guard. This anonymous caller stated that the Donald Ray had been sighted and the survivors would be picked up around 5:00 o'clock. He requested that the message be passed on in the village. Mr. Powell could not identify the person by name or rank except that the caller represented himself to be with the Coast Guard. No objection was made as the testimony was given, nor was any motion made to strike it at the close of cross examination. It was not until the close of the whole evidence in the case that the Government moved to strike it.

We need not consider its admissibility as such [21] for it could not possibly have been harmful. Almost identical testimony was given by Captain Bryant without objection and without any motion then or later made to strike it.[22]

After a careful trial and a detailed and patient consideration of all of the evidence, the Trial Court applied proper legal standards and made fact conclusions which certainly pass muster under F.R.Civ.P. 52(a), 28 U.S.C.A.

There it ends.

Affirmed.

21. The Appellees justified admissibility on these authorities. McCormick, Evidence, pages 405–406; Van Riper v. United States, 2 Cir., 1926, 13 F.2d 961, certiorari denied 273 U.S. 702, 47 S.Ct. 102, 71 L.Ed. 848; Andrews v. United States, 10 Cir., 1935, 78 F.2d 274, 105 A.L.R. 322; Jarvis v. United States, 1 Cir., 1937, 90 F.2d 243, certiorari denied 302 U.S. 705, 58 S.Ct. 25, 82 L.Ed. 544; 20 Am. Jur., "Evidence" § 368; 7 Wigmore, Evidence § 2155 at 617 (3 ed. 1940); United States v. Bucur, 7 Cir., 1952, 194 F. 2d 297.

22. "Q. Later that day * * * were you informed that the Coast Guard had located the Donald Ray? A. Yes, sir, I was.

"Q. From whom did you hear that they had located the Donald Ray? A. Captain Floyd [a Mayport fisherman], Captain Hilton Floyd stopped in front of my house * * * and told me, he says: 'Well,' he says, 'they've located the boys and they've got a plane circling them and it's only a matter of a few minutes now probably before the Coast Guard will rescue them.' He says: 'I think I haven't got anything to worry about now that they've found them; that's been the main trouble in locating them.'"