417 F.2d 164
 In the Matter of the Libel and Petition of the AMERICAN OIL
COMPANY, as owner of the SS AMOCO VIRGINIA, her
engines, tackle, apparel, etc., in a
cause of exoneration from or
limitation of liability.
UNITED STATES of America, Claimant & Plaintiff-Appellant,
v.
AMERICAN OIL COMPANY, as owner of a cargo of gasoline and
heating oil formerlyladen on the SS Amoco
Virginia, in personam, Libelant &
Defendant-Appellee.
 No. 26455.
 United States Court of Appeals Fifth Circuit.
 Oct. 3, 1969, Rehearing Denied Oct. 28, 1969.
 
 1
 James R. Gough, Asst. U.S. Atty., Houston, Tex., William E. Gwatkin, III, Admiralty & Shipping Section, Civil Division, Department of Justice, Alan S. Rosenthal, Atty., Appellate Section, Civil Div., U.S. Dept. of Justice, Washington, D.C., Edwin L. Weisl, Jr., Asst. Atty. Gen., Morton L. Susman, U.S. Atty., for appellant.
 
 
 2
 Frank G. Harmon, Baker, Botts, Shepherd & Coates, Houston, Tex., James K. Nance, Atty., Alfred A. Lohne, New York City, Joe R. Greenhill, Jr., Houston, Tex., Mendes & Mount, New York City, of counsel, for appellee.
 
 
 3
 Before TUTTLE and GEWIN, Circuit Judges, and COMISKEY, District Judge.
 
 COMISKEY, District Judge:
 
 4
 The United States of America claims a salvage award on principles of maritime law. The lower court denied the salvor's claim. We reverse.
 
 
 5
 The S.S. AMOCO VIRGINIA was a steel hulled tank vessel of about 12,527 gross tons, approximately 571 feet in length owned by the American Oil Company. Just after midnight on Sunday, November 8, 1959 she was moored to the dock of the Hess Terminal Corporation, in the Houston Ship Channel near Galena Park, Texas. In this berth she was loading a cargo of gasoline and heating oil. She was almost fully laden with more than six million gallons of this cargo, when a fire ignited on the surface of the water in the vicinity of her berth. The flames quickly spread surrounding the vessel and some of her barges moored alongside. One of her barges exploded, propelling flaming gasoline onto the vessel. Explosions followed in some of her cargo tanks. Fire spread over other portions of the ship, igniting portions of her cargo, and flames licked as high as her masts. Those on board the vessel were unable to fight the fire with her firefighting systems. Several crew members were killed. The vessel and her cargo lay burning out of control with grave danger of explosion. The adjacent docks stood threatened with a major disaster. The Houston Ship Channel was ordered closed by the U.S. Coast Guard. Fire departments from the City of Houston and eighteen other municipalities joined in the fight to stop the fire along with a fireboat from the Houston Navigation District, three Coast Guard picket boats assigned to the Captain of the Port, Coast Guard personnel and equipment from the Captain of the Port, and fire parties from a Coast Guard Base and from various Coast Guard vessels in Galveston, Texas, and Sabine Pass. As morning arrived, the fire fighting had exhausted the chemical foam required to extinguish a fuel fire of this sort. The foamite supply used up to his time had come from the Coast Guard, Hess Terminal Corporation, the Houston Fire Department, the Houston Navigation District, and private industries along this area of the Houston Ship Channel. Now it was seven o'clock in the morning and the fire was almost under control. All of the chemical foam needed to fight this fuel fire was gone. Suddenly, the fire built up again, regained in power, and surpassed the intensity of the conflagration that the firefighters had conquered during the dark and dawning morning hours. A series of explosions occurred, and a new major firefighting effort was demanded. But there was no chemical foam left. The firefighters had no weapons with which to fight.
 
 
 6
 However, foam to fight was on its way. At about 7:00 A.M. the U.S. Air Force at Ellington Air Force Base sent ten 55-gallon drums of foam to the scene and another ten barrels at 9:30 A.M. The Coast Guard Houston Port Captain, with approval from the Eighth Coast Guard District office in New Orleans, bought more chemical foam from commercial sources. A veritable air lift was begun to bring foam into Houston through Ellington Air Force Base with the first plane in the airlift arriving at Ellington at 11:59 A.M. Later that afternoon Air Force and Navy aircraft arrived with foam at almost ten minute intervals. This foam air lift continued for seven hours, stopping at about 7:00 P.M. when the Houston Civil Defense spokesman advised no further need for foam. The fire had been brought for the second-- but final-- time under control. This foam air lift consisted of 47 flights, hauled more than a half million pounds of foam, involved more than 400 Air Force and Navy personnel, and used some 42 Air Force and Navy vehicles.
 
 
 7
 The lower court found that,
 
 
 8
 'It would have been impossible to put out the fire at the time it was extinguished without the cooperation of the U.S. Air Force and Navy. * * * the value of the S.S. AMOCO VIRGINIA, after the fire was extinguished, was $415,000.00 * * * and the value of her cargo was $491,326.72. * * * the efforts of the Air Force and Navy were a contributing factor in preserving more than $900,000.00 worth of property for the benefit of the American Oil Company. * * *' The district judge further found that, 'the only actual expenses incurred by the Air Force and Navy * * * in furnishing foam to the scene of the fire was $35,641.20, representing the cost of the foam which was furnished to the scene of the fire, and $90.00 in lost equipment.'[1]
 
 
 9
 The Court, however, rejected the salvor's claim for the $35,641.20 on the principle that 'the United States of America as sovereign has no inherent right to recover for salvage services under the general maritime law.'[2]
 
 
 10
 The lower court further denied the other claims of the salvor as follows:
 
 
 11
 $51,129.36 -- Transportation costs, military
 aircraft, 47 flights
 for 123.59 hours.
 2,168.23 -- Military personnel
 296.62 -- Transportation costs, military
 vehicles
 351.19 -- Civilian personnel cost
----------
$54,035.40
 
 
 12
 In rejecting these other salvage claims of the United States of America the Court barred their recovery on the further grounds that the Government failed to carry the burden of proving to what extent its salvage efforts 'contributed to preserving the S.S. AMOCO VIRGINIA and its cargo. * * *'[3]
 
 
 13
 The plaintiff makes its claim for salvage under the general maritime and admiralty law of the United States of America. The claim fits the salvage-- maritime law requirements, i.e. the S.S. AMOCO VIRGINIA disaster was a 'maritime peril from which the ship (and its cargo) * * * could not have been rescued without the salvor's assistance. * * * The act must be successful in saving, or in helping to save, at least a part of the roperty at risk.'[4] As stated by the Supreme Court in The Blackwall, 77 U.S. (10 Wall.) 1, 12, 19 L.Ed. 870 (1869), 'Salvage is the compensation allowed to persons by whose assistance a ship or her cargo has been saved, in whole or in part, from impending peril on the sea. * * * Success is essential to the claim. * * * More than one set of salvors, however, may contribute to the result, and in such cases all who engaged in the enterprise and materially contributed in the saving of the property, are entitled to share in the reward which the law allows. * * *' The remaining requirement to sustain this salvage claim is that 'the salvor's act must be voluntary, that is, he must be under no official or legal duty to render the assistance.' Gilmore & Black, supra; Davey v. The Mary Frost, 7 Fed. Cas. No. 3,591, p. 11 (E.D.E.D.Texas-- 1876); Thornton v. The Livingston Roe, 90 F.Supp. 342 (S.D.N.Y.1950). It is on this legal point that the American Oil Company resists the salvage claim. It argues that the salvage services rendered by the United States Coast Guard represented nothing more than a fulfillment of its pre-existing legal duty to render such services to a vessel in distress. We adopt the findings of the lower court and agree with the American Oil Company that the salvage services rendered herein were the acts and services of the United States Coast Guard. In rendering such services, however, the United States Coast Guard did solicit and receive valuable service and support from the United States Air Force and from the United States Navy, as well as from commercial sources.
 
 
 14
 In the first place, it should be remembered that the claim of the United States for salvage does not include any costs for the U.S. Coast Guard, but only covers items of cost for the United States Air Force and the United States Navy. The National Government makes its own policy in deciding when it will make a claim for salvage and when it will not.[5] In this case, then, the National Government has apparently concluded as a matter of policy to make a salvage claim for services rendered by the U.S. Coast Guard to the extent, and only to the extent, that the Coast Guard used the services and supplies of the Air Force and Navy. This does not mean that the Coast Guard has no right to salvage for its own services and supplies. The pre-existing duty bar to salvage by the U.S. Coast Guard has not been sustained by the Courts.
 
 
 15
 The establishment and duties of the Coast Guard are found in the United States Code, Title 14, Part I. 14 U.S.C. 2 sets out the primary duties of the Coast Guard-- the enforcement of federal laws on the high seas, promotion of safety of life and property on the high seas, maintenance of aids to maritime navigation and rescue facilities for the promotion of safety on the high seas, and availability as a specialized service for the Navy in time of war. Particularly, 14 U.S.C. 88 directs itself to the job of the Coast Guard in the saving of life and property. The pertinent part of this statute applicable to the facts of our case reads as follows:
 
 
 16
 (a) In order to render aid to distressed persons, (and) vessels * * * on the high seas and on waters over which the United States has jurisdiction * * * the Coast Guard may: (1) perform any and all acts necessary to rescue and aid persons and protect and save property; (b) The Coast Guard may render aid to persons and protect and save property at any time and at any place at which Coast Guard facilities and personnel are available and can be effectively utilized.'
 
 
 17
 Reading the words of the statute as they are written, we find that the Coast Guard's power to render fire fighting services within the context of this case is a permissive function. The statute says the Coast Guard may perform these functions. The permissiveness of the Coast Guard's function was recognized in United States v. De Vane, 306 F.2d 182, 186 (5th Cir. 1962):
 
 
 18
 'The position of the government, with which we agree, is that Gavagan, (United States v. Gavagan, 280 F.2d 319 (5 Cir. 1960)) went no further than affirming what is clear from the statutes-- that the decision to undertake or abandon a rescue is discretionary with the Coast Guard and the other government agencies who participate in the National SAR plan.'
 
 
 19
 Again in Frank v. United States, 250 F.2d 178, 180 (3rd Cir. 1957) cert. den. 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1069 (1958) it was held:
 
 
 20
 The Coast Guard, like a private salvor, renders voluntary assistance where no duty to help is owed the person or vessel in distress. True, it is a statutory function of the Coast Guard to establish and operate rescue facilities. 14 U.S.C. 2. Congress has also provided that the 'Coast Guard may render aid to persons and protect and save property at any time and at any place at which Coast Guard facilities and personnel are available and can be effectively utilized.' 14 U.S.C. 88(b). But this legislation falls short of creating a governmental duty of affirmative action owed to a person or vessel in distress.'
 
 
 21
 For other cases finding no legal duty on the part of the Coast Guard to rescue or to furnish assistance, see United States v. Gavagan, 280 F.2d 319, 328 (5th Cir. 1960), cert. denied 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365 (1961); United States v. Sandra & Dennis Fishing Corp., 372 F.2d 189, 195 (1st Cir. 1967), cert. denied. Accordingly, we conclude that there was no pre-existing legal duty which compelled the Coast Guard to render the fire fighting and salvage services in this case. The same permissiveness finds its way into the publication issued by the United States Coast Guard, C.G.-- 239, dated July 1, 1958 entitled 'Security of Vessels and Waterfront Facilities'. The record shows that these regulations set out the duties of the Captain of the Port which in this case applied to Coast Guard Commander of the Port of Houston. Paragraph 12-8 from the Manual for Port Security reads as follows:
 
 
 22
 'Paragraph 12-8. Firefighting equipment is provided for the purpose of protecting Coast Guard property. Fire protection for private and commercial waterfront facilities is a responsibility of fire protection officials of the community. However, when Coast Guard equipment is available it may be utilized to assist the efforts of the local fire officials.' Ex. Vol. 42-44.
 
 
 23
 Despite the permissiveness of the Coast Guard's efforts, the United States of America, as a matter of policy, has elected not to make a claim for salvage on behalf of the Coast Guard. However, to the extent that the Coast Guard obtained services and supplies from the United States Air Force and the United States Navy, the government does assert a salvage claim. Salvage claims by these two military branches are not unusual, as the lower court correctly observed in its findings:
 
 
 24
 Congress has expressly authorized claims for salvage services performed by the Air Force and the Navy, 10 U.S.C. Sec. 7365, 9804. As to the Air Force, Congress has provided (10 U.S.C. Sec. 9804): Under the direction of the Secretary of Defense, the Secretary of the Air Force may settle, or compromise and receive payment of a claim by the United States for salvage services performed by the Department of the Air Force for any vessel.
 
 
 25
 As to the Navy, Congress has similarly provided (10 U.S.C. Sec. 7365):
 
 
 26
 The Secretary of the Navy, or his designee, may consider, ascertain, adjust, determine, compromise, or settle and receive payment of any claim by the United States for salvage services rendered by the Department of the Navy to any vessel.'
 
 
 27
 The American Oil Company also argues that since the United States Air Force and the United States Navy could not legally refuse to respond to the Coast Guard's request for services and supplies, and therefore, the expenses of the Air Force and Navy should not be recovered. Assuming, arguendo, that these two military forces were legally bound to service the Coast Guard with assistance, it does not follow that the United States of America should be barred from recovery for the services rendered. If nothing else, the alleged pre-existing legal duty on the part of the Air Force and Navy would be owed to the United States Coast Guard, and not to the American Oil Company. The pre-existing duty which can disqualify a salvor from recovering must run between the salvor and the owner of the vessel and cargo salvaged.
 
 
 28
 Finally, the American Oil Company resists the salvage claim on one remaining ground. American urges that the United States Air Force and the United States Navy should be disqualified for the salvage service claim because its efforts were rendered pursuant to the National Search and Rescue Plan. The National Search and Rescue Plan represents the result of the President's Air Coordinating Committee to implement recommendations of the civil air policy, May 1954, which stated the following:
 
 
 29
 'To provide an overall search and rescue plan for effective utilization of all available facilities to include provisions for the control and coordination of all type of search and rescue.'
 
 
 30
 The plan was jointly signed and adopted March 30, 1956 by the Secretary of the Treasury, Secretary of Defense, Secretary of Commerce, Federal Communications Commission, and Civil Aeronautics Board. A copy of the National Search and Rescue Plan, commonly known as SAR, is in the record. (Respondent Exhibit #26) An outlining of the plan is found in Chief Judge Brown's opinion in United States v. Gavagan, 280 F.2d 319, at 322 (5th Cir. 1960). Briefly, the Plan is intended to effectively utilize all facilities for search and rescue missions, to render aid to persons and property in distress, to coordinate efforts under a single federal agency for the sake of efficiency and economy. The SAR Plan, however, recognizes the statutory role of the United States Coast Guard for the promotion of safety on the high seas and inland waters. The SAR Plan divides the planet earth into three regions, namely, inland region, maritime region, and overseas region. The Coast Guard is named as the regional SAR coordinatory for the maritime region, which includes the Houston Ship Channel. The Plan goes on to outline the organization of the SAR network and the conduct of its operations. Two sections of the SAR plan are relevant to this case:
 
 
 31
 6d.(2) Agreements between a Regional SAR Coordinator and the Army, Navy, Air Force, JCS Unified Command, or Coast Guard will provide for the fullest practicable utilization of the facilities of such agencies in regional SAR missions under the Regional SAR Coordinator, consistent with the statutory responsibilities and authorities and assigned functions of such agencies, and will provide that such agencies delegate to the Regional SAR Coordinator or authority for the coordination of their facilities committed to such missions. 6f.(6) This plan does not encompass SAR for such activities as: salvage operations, submarine rescue special or unusual operations of the Armed Forces, emergencies affecting public welfare occurring as a result of enemy attack, insurrections, civil disturbances, earthquake, fire, flood, or other public disasters or equivalent emergencies which endanger life and property or disrupt the usual process of government. However, the SAR organization and its facilities should be utilized to the maximum extent feasible in connection with the above activities.
 
 
 32
 In Paragraph 6d. (2) above, it is obvious that the SAR Plan did not intend to change the 'statutory responsibilities' of the United States Coast Guard with regard to its functioning under this Plan. The permissive duty of the Coast Guard (14 U.S.C. 88) is clearly still the law for this case and the SAR Plan never intended to change it. Further, Paragraph 6f. (6) above exempted the plan from salvage operations. This reasoning is buttressed by the quote supra from the DeVane case which we repeat because of its reference to the SAR Plan.
 
 
 33
 'The position of the government, with which we agree, is that Gavagan went no further than affirming what is clear from the statutes-- that the decision to undertake or abandon a rescue is discretionary with the Coast Guard and the other government agencies who participate in the National SAR plan.'
 
 
 34
 Accordingly, the salvage claim of the National Government cannot be defeated because its Coast Guard is part of the SAR Plan. The SAR Plan imposes no extra statutory pre-existing legal duty on the Coast Guard. The SAR Plan recognizes the 'statutory responsibilities' of the Coast Guard which, as we have found, are permissive.
 
 
 35
 Accordingly, the amount of the salvage award found by the lower court in the sum of $89,676.60, but denied to the National Government on legal grounds, should be entered as a judgment for the appellant. The judgment of the lower court is reversed and remanded with directions to enter judgment as set out herein.
 
 
 
 [1]
 Findings of Fact and Conclusions of Law-- Record on Appeal p. 590
 
 
 [2]
 Id. at 592
 
 
 [3]
 Id. at 594
 
 
 [4]
 Gilmore & Black, The Law of Admiralty p. 445; Robinson, Admiralty 709 (1939); 1 Benedict, Admiralty f 117 (6th ed. 1940); 1 Norris; The Law of Seaman f 183 (1952); Kennedy the Law of Civil Salvage (3 ed. 1936) p. 2 Findings of Fact, paragraph 12-- 'Although I find it would have been impossible to put out the fire at the time it was extinguished without the cooperation of the U.S. Air Force and Navy, pursuant to the Coast Guard's request therefor, * * * I find that the efforts of the Air Force and Navy were a contributing factor in preserving more than $900,000.00 worth of property for the benefit of the American Oil Company. * * *'
 
 
 [5]
 'It is settled doctrine that nothing prevents a government from claiming salvage, whether the service was performed by a Navy vessel or a government-owned merchant ship. The United States usually does-not claim an award but that is a matter of policy and has nothing to do with legal right. In The Impoco, Judge Ward wrote:
 '* * * the United States relies upon its inherent right as an owner to recover compensation for salvage services in accordance with the ancient doctrine of the maritime law. Such services are voluntary and they are just as voluntary in the case of men of war and public vessels generally as they are in the case of private vessels; i.e. it is no part of their duty to render such services. While I can see that a sovereign would and perhaps should consider it beneath his dignity to ask for compensation for saving property at sea, I can imagine no legal reason to prevent him from doing so." Gilmore & Black, The Law of Admiralty, p. 455.