# United States Court of Appeals

## For the First Circuit

___

No. 02-1619

THAMES SHIPYARD AND REPAIR COMPANY,
Plaintiff in Cross Claim, Appellant,

v.

UNITED STATES,
Defendant, Appellee.

___

No. 02-1620

NORTHERN VOYAGER LIMITED PARTNERSHIP;
ONEBEACON AMERICA INSURANCE COMPANY f/k/a/
COMMERCIAL UNION INSURANCE COMPANY,
Plaintiffs, Appellants,

v.

UNITED STATES,
Defendant, Appellee.

___

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

___

Before
Torruella, Circuit Judge,
Campbell and Stahl, Senior Circuit Judges.

___

Thomas J. Muzyka, with whom Robert E. Collins and Clinton & Muzyka, P.C. were on brief, for appellant Thames Shipyard and Repair Company.
Michael J. Rauworth, with whom Cetrulo & Capone LLP were on brief, for appellants Northern Voyager Limited Partnership and OneBeacon America Insurance Company f/k/a Commercial Union Insurance Company.

Stephen F. White, with whom Wright, Constable & Skeen LLP was on brief, for amicus curiae C-Port, Incorporated.
Peter F. Frost, Trial Attorney, Civil Division, with whom Robert D. McCallum, Jr., Assistant Attorney General, Donald J. Sullivan, United States Attorney, and Peter Levitt, Assistant United States Attorney, were on brief, for appellee.

—————————————

November 26, 2003

—————————————

**TORRUELLA**, <u>Circuit Judge</u> (Concurring in part, Dissenting in part). I agree with the remand of the plaintiff's claim against the Coast Guard for interference with communications between the commercial salvor and NORTHERN VOYAGER. I respectfully disagree, however, with the majority's reasoning, its holding, and with the scope of the remand.

First, I am decidedly in disagreement with the majority's recognition of authority by the Coast Guard to forcefully remove the master of a vessel[17] from his ship, thus preventing him from continuing efforts to save it. With due respect, there is no authority in law, practice, or maritime tradition that validates such action by the Coast Guard, nor am I aware of the government's having claimed such extraordinary powers before the inception of this case. Because the Coast Guard lacked the authority to remove the NORTHERN VOYAGER's master from his vessel against his will, the discretionary function exception relied upon by the government is inapposite. <u>See</u> <u>Hatahley</u> v. <u>United States</u>, 351 U.S. 173, 181 (1956) (holding that an agent acting outside his delegated authority is not protected by the discretionary function exception); <u>Red Lake Band of Chippewa Indians</u> v. <u>United States</u>, 800 F.2d 1187, 1196 (D.C. Cir. 1986) (holding that a "decision cannot be shielded from liability if the decisionmaker is acting without actual authority"); <u>Birnbaum</u> v. <u>United States</u>, 588 F.2d 319, 329

---

[17]And volunteering officers.

(2d Cir. 1978) (holding that "discretionary function can derive only from properly delegated authority").

The new, misguided doctrine promoted by the government in this appeal will have far reaching implications for the maritime and marine insurance industries. At a minimum, it will result in a shift in the decision-making responsibility for the safety and salvage of a ship from the person best qualified and most knowledgeable regarding his vessel, the master, to a governmental agency that, as well intentioned as it may be in its actions, is not even required by law to engage in any rescue attempt. See infra I(B)(1). In effect, the Coast Guard is now empowered to arrive at the scene, forcibly remove the ship's captain, and leave the scene of the marine casualty without any duty of engaging in any attempt to save the vessel.

Such a momentous shift in policy and such an extraordinary grant of authority should not be undertaken absent a clear legislative mandate expressed both in the text of the statute and in its legislative history. Ordinarily, major policy changes of this nature are the result of an unambiguous Congressional grant, written in plain language, enacted after considerable public hearings and input from the affected public, thus providing the courts with clear guidance in its judicial function. In this case, one looks in vain for such background or guidance. It is nowhere to be found. The government asks this Court to take a leap of

faith based on its say, and with a dearth of authority.  The very fact that there is no judicial decision, legislative history or prior claims to such powers, notwithstanding the over 39,000 maritime rescue interventions effectuated every year by the Coast Guard,[18] speaks volumes about the government's claim to the existence of such power.  See General Elec. Co. v. Gilbert, 429 U.S. 125, 143 (1976) (citing United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 858-59, n.25 (1975); Espinoza v. Farah Mfg. Co., 414 U.S. 86, 94 (1973)) (noting that courts have refused to follow administrative guidelines when they conflict with past pronouncements of an agency); see also Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 57 (1983) (requiring an agency to provide reasoned analysis before changing its standards).

The majority's reliance by analogy on state police power legislation[19] is particularly inappropriate considering that the federal government lacks a similar police power.  See Lottery Case, 188 U.S. 321 (1903) (holding "that there is no such thing as a Federal police power except in respect of those specific subjects delegated to Congress, such as treason, counterfeiting, piracies

---

[18]U.S. Coast Guard, 2002 Coast Guard Ann. Rep.

[19]Analogies between state and federal statutes can be a hazardous enterprise.  See, e.g., Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Sante Fe Ry. Co., 470 U.S. 451, 470 (1985) (refusing to transfer, by analogy, the wording of a state statute into a federal statute.)

and felonies on the high seas and offences against the laws of nations"). Although I will discuss this point more fully below, it should be noted that the state statutes cited as authority for forcible removals in land-based emergencies contain specific statutory language or have legislative histories granting such authority. These state statutes and authorities are particularly inapposite to the quintessential maritime scenario presented by this appeal, one which should be properly guided solely by the uniquely federal admiralty laws, practices and traditions. <u>See</u> U.S. Const. art. III, § 2 (specifically extending federal judicial power to "all Cases of admiralty and maritime Jurisdiction"); Fed. R. Civ. P. 9(h), 14(c), 38(e), & 82 (applying a distinct set of rules for admiralty cases); <u>see generally</u> Thomas J. Schoenbaum, <u>Admiralty and Maritime Law</u> § 3-2 (3d ed. 2001) (explaining the uniqueness of admiralty law).

## I. <u>Discretionary immunity only applies if the actor had actual authority</u>

Discretionary immunity protects government decisions from tort liability only when the decision-maker is acting within the scope of his actual authority. <u>See</u>, <u>e.g.</u>, <u>Hatahley</u>, 351 U.S. at 180-81 (holding that the discretionary function does not apply where the decision-maker lacks authority); <u>K.W. Thompson Tool Co. v. United States</u>, 836 F.2d 721, 727 n.4 (1st Cir. 1988) (stating that a "decision cannot be shielded from liability if the

decisionmaker is acting without actual authority") (internal citation and quotations omitted); <u>Red Lake Band of Chippewa Indians</u>, 800 F.2d at 1196-97 (determining that unauthorized actions are not shielded from liability under the discretionary function exception); <u>Birnbaum</u>, 588 F.2d at 329-30. The majority correctly presented this aspect of the discretionary function test. However, the majority incorrectly concluded that the Coast Guard had authority to order the evacuation of the NORTHERN VOYAGER.

The issue upon which I most ardently disagree with the majority is whether the Coast Guard, when asked to provide salvage assistance to a stricken vessel, has authority under 14 U.S.C. § 88, or any other statute, to compel an unwilling master to quit salvage efforts and to evacuate his vessel when Coast Guard personnel determine that further salvage efforts would be futile or dangerous.

### A. **14 U.S.C. § 88 does not give the Coast Guard unbridled authority**

Whatever the scope of 14 U.S.C. § 88, the statute does not confer unlimited authority upon Coast Guard officials to act in any way they see fit merely because they are engaged in rescue efforts. It is true that the statute's cryptic direction to "perform any and all acts necessary" may sound like a grant of unlimited authority to the Coast Guard.[20] Nevertheless, the

---

[20]In pertinent part, 14 U.S.C. § 88 provides:

language does not empower the Coast Guard, in a rescue context, to issue orders without regard to the statute's purpose or the rights of private citizens.

A glance at identical language from analogous <u>federal</u> statutes reveals that Congress cannot have intended such "any and all acts" provisions to constitute an independent grant of unbounded authority.[21] In nearly every instance in which Congress

---

(a) In order to render aid to distressed persons, vessels, and aircraft on and under the high seas and on and under the waters over which the United States has jurisdiction and in order to render aid to persons and property imperiled by flood, the Coast Guard may:
(1) perform any and all acts necessary to rescue and aid persons and protect and save property;
(2) take charge of and protect all property saved from marine or aircraft disasters, or floods, at which the Coast Guard is present, until such property is claimed by persons legally authorized to receive it or until otherwise disposed of in accordance with law or applicable regulations, and care for bodies of those who may have perished in such catastrophes;
(3) furnish clothing, food, lodging, medicines, and other necessary supplies and services to persons succored by the Coast Guard.

[21]Historically, Congress has only employed the phrase "any and all acts" when furnishing a newly-created administrative agency or program with sufficient flexibility to accomplish its central statutory purposes. <u>See</u>, <u>e.g.</u>, 16 U.S.C. § 583j-2 (establishing a foundation under the supervision of the Forest Service and authorizing that foundation to perform "any and all acts necessary and proper" to carry out the purposes of the foundation); 16 U.S.C. § 3703 (authorizing the National Fish and Wildlife Foundation to perform "any and all acts necessary and proper"); 20 U.S.C. § 5509 (establishing the National Environmental Education and Training Foundation and authorizing the Foundation to perform "any and all acts necessary and proper"); 43 U.S.C. § 373 (authorizing the Secretary of the Interior to perform "any and all acts" to make rules necessary to implement a program of reclamation and irrigation of lands by the federal government).

has granted an agency authority to "perform any and all acts necessary" to further some legislative goal, it is evident from the context that the provision grants an agency general implementary powers, but is not intended to expand the scope of that agency's powers "beyond those that may fairly be implied from the substantive sections and the functions there defined." See PSC of New York v. FERC, 866 F.2d 487, 492 (D.C. Cir. 1989) (citing Mobil Oil Corp. v. FPC, 483 F.2d 1238 (D.C. Cir. 1973)).

Not surprisingly, when construing other statutes employing this phrase, this Court has found that the phrase "any and all acts" does not itself grant independent powers, but merely provides for implementation of the core purposes of the statute. For example, when construing analogous language from the Federal Power Act, we concluded:

> While the Federal Power Act contains a "necessary and appropriate" provision, see 16 U.S.C. § 825h (granting FERC "power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary and appropriate"), that provision merely augments whatever existing powers have been conferred on FERC by Congress, without itself comprising a source of independent authority to act.

Boston Edison Co. v. FERC, 856 F.2d 361, 369-70 (1st Cir. 1988) (emphasis in the original) (internal citations omitted); see also

---

I think it self-evident that, despite conferring these agencies with the power to perform "any and all acts" in furtherance of some statutory purpose, Congress did not thereby confer unfettered authority upon agencies such as the Forest Service or National Fish and Wildlife Foundation.

New England Power Co. v. FPC, 467 F.2d 425, 430-31 (D.C. Cir. 1972).

The phrase "any and all acts" authorizes the Coast Guard to implement and maintain a capability to conduct search and rescue operations. The phrase does not literally mean that the Coast Guard may perform any action that is tangentially rescue-related, without regard to that action's lawfulness, or proper delegation, or potential impact on the rights of civilian mariners.[22]

The majority recognizes the logic of this argument in part when it notes that the Coast Guard's power under the statute is not unbridled. Maj. Op. at II(B)(3). To avoid giving the Coast Guard the unlimited power it claims, yet still give it enough authority to meet the discretionary immunity test, the majority judicially creates a limitation to § 88 out of whole cloth. It holds that Coast Guard authority exists only during life-threatening situations when there is an objectively reasonable belief by safety officers that a true emergency exists and there is an immediate need for assistance or aid. Needless to say, there is no mention of such a limitation in the congressional history or in previous case law regarding § 88, yet the majority depends on this limitation to uphold the proposition that the Coast Guard had

---

[22]To indulge in hypotheticals: while the statute would undoubtedly authorize the Coast Guard to spend money and to use labor conducting a rescue, it plainly would not authorize the Coast Guard to shoot an obstreperous mariner who refused to comply with the suggestions of Coast Guardsmen providing rescue assistance.

actual authority.

The problem with judicial legislation is that it often conflicts with the wording and intent of the statute. Such is the present case. The majority's creation conflicts with the very purpose of the discretionary function exception. The "basis of the discretionary function exception was Congress' desire to prevent judicial second guessing." Berkovitz v. United States, 486 U.S. 531, 536-37 (1988) (internal citation and quotations omitted). Once a court determines that an agency's decision was discretionary, it is not thereafter free to determine whether the decision-maker properly perceived the emergency to be life-threatening and whether such a perception was objectively reasonable. An agency's discretionary decisions are immune "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Therefore, once a decision is deemed to be the kind of decision the exception was designed to shield, this Court's inquiry must come to an end. As the Supreme Court concluded, "where the government is performing a discretionary function, the fact that the discretion is exercised in a negligent manner does not make [the exception] inapplicable." Attallah v. United States, 955 F.2d 776, 784 n.13 (1st Cir. 1992) (citing Dalehite v. United States, 346 U.S. 15, 33 (1952); Berkovitz, 486 U.S. at 539)) (further citations omitted). Likewise, where the Coast Guard is performing a discretionary function, the fact that the decision-maker wrongly

perceived the situation to be life-threatening will not make the exception inapplicable.

The better and, in my belief, the only correct interpretation of § 88 is one that does not require judicial legislation. Like statutes with similar language, § 88 grants the Coast Guard general implementary powers. It does not grant the Coast Guard the authority to threaten an unwilling master to evacuate his vessel if Coast Guard personnel determine that further salvage efforts would be dangerous.

I am unaware of any case or authority, nor does the majority cite to any, conferring such sweeping authority upon the Coast Guard in the search and rescue context, other than the statute in question.[23] Keeping these general limitations in mind, we turn to

---

[23]The majority also cites Coast Guard Manuals to support the proposition that the Coast Guard has actual authority during search and rescue operations to forcefully remove a ship's crew. First, I do not read any language in that Manual indicating that the Coast Guard has the authority to force a master off his vessel. Second, Coast Guard manuals do no more than serve as a "training and operational tool" for search and rescue operations. U.S. Coast Guard, National Search and Rescue Manual (1991). They are nothing more than "reference documents" to aid the Coast Guard and other rescue groups outside the Coast Guard. See U.S. Coast Guard, Coast Guard Addendum to the National Search and Rescue Manual. By no means can a manual create authority for the Coast Guard when no such power has been authorized by Congress. See also Christensen v. Harris County, 529 U.S. 576, 587 (2000) (reiterating that statutory "interpretations contained in . . . agency manuals" do not warrant deference.) Third, the United States National Search and Rescue Supplement recognized that Coast Guard negligence "may, in some circumstances, create legal liability" if an "attempted rescue . . . is conducted so that it . . . worsens the situation of . . . one in distress." National Search and Rescue Committee, United States National Search and Rescue Supplement to

the substantive language and purpose of § 88 to determine whether the Coast Guard's evacuation order was within the permissible range of actions authorized by the statute.

### B.    Scope of authority

The Coast Guard is the historical product of five federal agencies.[24]  In 1915 "the U.S. Revenue Cutter Service and the U.S. Lifesaving Service were merged to form a new agency, the U.S. Coast Guard."  D.C. Baldinelli, The U.S. Coast Guard's Assignment to the Department of Homeland Security: Entering Uncharted Waters or Just a Course Correction? (Dec. 9, 2002), available at http://www.uscg.mil/hq /g-cp/history/Homeland_Security_Baldinelli. html.  In the 1930s and 1940s the Coast Guard absorbed the U.S. Lighthouse Service, the Steamboat Inspection Service and the Bureau of Navigation.  Id.  In 1967, the Coast Guard was transferred from the Treasury Department to the Department of Transportation.  Id. In 2003, the Coast Guard was transferred to the Department of Homeland Security.  See 6 U.S.C.S. § 101 (2003).

It thus appears that the Coast Guard, or its predecessors, has been with us since the inception of the Republic.

---

the International Aeronautical and Maritime Search and Rescue Manual (May 2000).

[24]The agencies that merged into the Coast Guard are:  the United States Lighthouse Service (1 Stat. L. 53) (1789); the Revenue Cutter Service (12 Stat. L., 639) (1863); the Steamboat Inspection Service (10 Stat. L., 1852) (1852); the U.S. Life-Saving Service (20 Stat. L., 163) (1878); and the Bureau of Navigation (23 Stat., L. 118) (1884).

Yet, in all of its various forms there is not a single reported case, not a shred of documented evidence, not an iota of coherent legislative history, sanctioning the exercise of the extraordinary executive powers claimed by the Coast Guard in this case.

The earliest Congressional statutes authorizing a government agency to perform search and water rescues provided that rescuers could only aid distressed sailors. See Act of Dec. 22, 1837, ch. 1, 5 Stat. 208 (1837) (cited in The Huntsville, 12 F.Cas. 996 (E.D.S.C. 1860) (No. 6916) (Congress authorized the President "to cause . . . public vessels . . . to cruise upon the coast, in the severe portion of the season . . . to afford such aid to distressed navigators as their circumstance and necessities may require; and such public vessels shall go to sea prepared fully to render such assistance")). The authority granted by this original statute was only to "aid" navigators as "their" necessities required. See id. Other Congressional legislation similarly established Coast Guard stations and provided Coast Guard funding for the purpose of "assisting vessels . . . from the perils of the sea." Act of Apr. 19, 1906, ch. 1640, 34 Stat. 123; see also Act of Aug. 29, 1916, ch. 417, 39 Stat. 601 (providing funding for cutters to be used for "rendering aid to vessels in distress"); Act of June 24, 1914, ch. 124, 38 Stat. 387 (providing funding for two cutters to provide medical aid to vessels engaged in the deep-sea fisheries); Act of May 12, 1906, ch. 2454, 34 Stat. 190 (providing

funding for a steam vessel to provide service at sea).

Similar to previous statutes granting a governmental agency the power to "aid" distressed sailors, under § 88, Congress granted the Coast Guard broad powers to "render aid," "rescue and aid" and "furnish clothing, food, lodging, medicines, and other necessary supplies" to distressed persons and vessels. 14 U.S.C. § 88(a)(3). Neither the history of § 88 nor case law interpreting § 88 support the proposition that the Coast Guard has the authority to force a master to evacuate his vessel.

Cases involving § 88 focus exclusively on two issues. First, courts uniformly hold that the Coast Guard is legally indistinguishable from private mariners regarding its duty to rescue.[25] See, e.g., In re American Oil Co., 417 F.2d 164, 168 (5th Cir. 1969). Second, reviewing courts have concluded that the Coast Guard becomes liable for an attempted rescue when its actions fail to comply with standards of ordinary care and acceptable seamanship. United States v. Sandra & Dennis Fishing Corp., 372 F.2d 189, 195 (1st Cir. 1967).

### 1. Duty to rescue

The Coast Guard does not have a duty to provide aid or

---

[25]The majority disagrees and contends that, in circumstances such as the present, Coast Guard operations are relevantly different from the situation in which a private vessel comes to the rescue of a distressed vessel. Maj. Op. at II(B)(3). Once again, the majority makes such an assertion without any supporting citations or referenced authority.

rescue services to distressed persons or vessels.  See Sagan v. United States, 342 F.3d 493, 498 (6th Cir. 2003) (finding that "[t]he United States Coast Guard does not have an affirmative duty to rescue persons in distress"); Sandra & Dennis Fishing, 372 F.2d at 195 (finding that the Coast Guard is under no obligation to "provide rescue service on demand").  So while § 88 empowers the Coast Guard to maintain rescue facilities and carry out rescue efforts, the Coast Guard is legally indistinguishable from a private salvor when it comes to providing rescue assistance. Accordingly,

> [t]he Coast Guard, like a private salvor, renders voluntary assistance where no duty to help is owed the person or vessel in distress.  True, it is a statutory function of the Coast Guard to establish and operate rescue facilities.  Congress has also provided that the "Coast Guard may render aid to persons and protect and save property at any time and at any place at which Coast Guard facilities and personnel are available and can be effectively utilized." 14 U.S.C. § 88(b).  But this legislation falls short of creating a governmental duty of affirmative action owed to a person or vessel in distress.

In re American Oil, 417 F.2d at 168 (quoting Frank v. United States, 250 F.2d 178, 180 (3d Cir. 1957)) (internal citation omitted).  Thus while § 88 authorizes the Coast Guard to conduct rescues, it does not impose any affirmative duty to do so.

### 2.  **Acceptable seamanship standard**

Once the Coast Guard engages in aid or rescue efforts, the United States, like its private counterparts, will be liable only where there is a failure to carry out the rescue mission or

aid in accordance with standards of "acceptable seamanship." Sandra & Dennis Fishing, 372 F.2d at 197. That means that "[w]hatever may be the limits of this principle with respect to volunteered salvage, we believe that if the Coast Guard accepts a mission it should conduct its share of the proceeding with acceptable seamanship." Id. (internal citation omitted).

Thus, once the Coast Guard begins providing rescue assistance to a distressed vessel or persons, its authority under § 88 is bounded by the duty of "acceptable seamanship" it owes to the vessel owner or distressed persons. Whatever else may be said about the limits of the statute, § 88 cannot be construed in a manner which would vitiate the Coast Guard's duty of "acceptable seamanship" when carrying out volunteer salvage services to distressed vessels or persons.

Therefore we are presented with the relatively straightforward question of whether the Coast Guard's forced evacuation order was consistent with principles of "acceptable seamanship." I conclude it was not. Had a private salvor coercively compelled the master and crew to quit salvage efforts and abandon the NORTHERN VOYAGER, there is no question but that the case would have proceeded to trial to determine whether the salvor's actions affirmatively worsened the condition of the vessel. Here, the Coast Guard, acting in its capacity as a private salvor, violated numerous principles of "acceptable seamanship" by

compelling the master to abandon the NORTHERN VOYAGER and wrongfully depriving him of the opportunity to halt further flooding of the vessel and await commercial salvage assistance.

### 3. Right to refuse unwanted salvage assistance

Though there are no cases directly on point as to whether an order such as the one issued by the Coast Guard is within the bounds of "acceptable seamanship,"[26] the law of salvage provides valuable guidance on this issue. Salvage law governs the rescue and salvage of vessels in marine peril.

One well-established principle is that shipowners and masters have a right to refuse salvage assistance. The right to refuse salvage is a firmly established right of vessel owners and masters: "[u]nder nearly all supposable circumstances when the master is in command and control of his own ship he may refuse and reject salvage services, and no volunteer salvor can force on him, and be rewarded for, services which he forbids." The Indian, 159 F. 20, 25 (5th Cir. 1908). This Court has previously acknowledged the master's right to refuse unwanted assistance. In Hamburg-American Line v. United States, we noted that "salvage services may not be forced on the unwilling." 168 F.2d 47, 56 (1st Cir. 1948). This view is consistent with the Supreme Court's statement that "salvage cannot be exacted for assistance forced upon a ship."

---

[26]For good reason, as the Coast Guard lacks the authority to issue such an order.

Merritt & Chapman Derrick & Wrecking Co. v. United States, 274 U.S. 611, 613 (1927). Other cases strongly support this interpretation of salvage law as well.[27] See New Harbor Protection Co. v. Steamer Charles P. Chouteau, 5 F. 463, 464 (D. La. 1881) (holding that a master has "a perfect right to decline any assistance that may be offered him: he should not be assisted against his will").

The majority claims that dicta in two district court cases limits the right to decline salvage assistance to instances where only the owner's property interests are at stake. First, it is important to remember that the majority is relying on mere dicta. Second, this dicta is of dubious value because the rule espoused is contrary to the well-established law of salvage. Third, the dicta cited by the majority limits the right to decline salvage assistance from a private salvor to instances when there is danger of large losses of property to third persons or when the

_____

[27]Leading admiralty treatises also recognize that masters can reject salvage assistance. According to Martin J. Norris, "[w]hen the master is in command and control of his own ship he may refuse and reject salvage services. A would-be salvor, under such circumstances, cannot force his services on the distressed vessel." Martin J. Norris, The Law of Seamen § 9:39 (4th ed. 2002). Additionally, even where a salvor's services have been accepted and assistance rendered, "the salvor must cease his services when requested to by the salved ship . . . . During the time that assistance is being rendered, the officers of the distressed vessel are at liberty to determine when the assistance rendered should be terminated." Id. Thomas J. Schoenbaum echoes this view: "Salvage cannot be forced upon an owner or his agent in possession of the vessel; a salvor who acts without the express or implied consent of the owner is a 'gratuitous intermeddler,' who is not entitled to any salvage award." Thomas J. Schoenbaum, 2 Admiralty and Maritime Law § 16-1 (3d ed. 2001).

master's decision to decline salvage assistance was "so palpably and so grossly wrong as to amount to positive misconduct in reference to the claims of humanity." Ramsey v. Pohatcong, 77 F. 996 (S.D.N.Y. 1896); Smit Americas, Inc. v. M/T Mantinia, 259 F. Supp. 2d 118, 134 (D.P.R. 2003). The NORTHERN VOYAGER did not pose a threat to the property of third persons. Captain Haggerty's decision to continue efforts to salvage his ship was also not so "palpably and grossly wrong," evidenced by the fact that the ship remained upright for fifty-five minutes after he was forced to evacuate the NORTHERN VOYAGER, and afloat for some time after capsizing, all of which was more than enough time to have saved his ship, particularly if the Coast Guard had not interfered with the salvor. The Coast Guard has never claimed that there was any regulatory, military, or law enforcement basis for compelling the NORTHERN VOYAGER's crew to evacuate their vessel. All of the officers who remained aboard the NORTHERN VOYAGER freely volunteered to do so, and there is no indication that any of them were acting in a deranged or reckless manner.

The language of § 88, as well as the long line of cases holding that the Coast Guard is legally indistinguishable from a private party when providing voluntary salvage assistance, compel the conclusion that the Coast Guard lacked authority and acted outside the bounds of "acceptable seamanship" forcing the crew to

abandon the NORTHERN VOYAGER.[28]

### 4. The Coast Guard is unlike state public safety officials

The lack of federal case law or legislative history granting the Coast Guard authority to force a captain from his vessel has led the majority to analogize the actions of the Coast Guard to actions of state public officials during times of emergencies on land. The majority concluded that it is "reasonable to _assume_" (emphasis added) that Congress intended to confer powers to the Coast Guard "analogous to those possessed by state safety officials, namely, the power to rescue a person even against his will in life-threatening situations." Maj. Op. at II(B)(3). I find such an assumption totally unwarranted and, like other parts of the majority opinion, unsupported by any authority.

First, there is nothing in the text of § 88 or its legislative history to support such an assertion, and furthermore, the assumption that Congress intended to confer such extraordinary powers by analogy or by implication is in itself a dubious

---

[28]It is important to note that we are only concerned with the scope of authority of the Coast Guard under § 88 to assist distressed persons, vessels, and aircraft on and under United States waters. Nothing in the majority opinion or in this dissent should be construed to apply to the Coast Guard in its military, law enforcement or regulatory capacities. Moreover, the right of the Coast Guard to evacuate its own personnel from a distressed vessel is not at issue here; had the Coast Guard simply withdrawn its personnel from the NORTHERN VOYAGER, without ordering the NORTHERN VOYAGER's master and officers to evacuate as well, the appellant would have had no cause of action against the United States.

proposition. See, e.g., Nat'l R.R. Passenger Corp., 470 U.S. at 470 (refusing to transfer, by analogy, the wording of a state statute into a federal statute because "neither the language of the [federal] statute nor the circumstances surrounding its passage" supported such an analogy).

Second, in those cases where courts have found that state safety officials were specifically granted the power to force people from their homes during life-threatening emergencies, that power had been authorized by specific legislative enactment. See, e.g., Alaska Stat. § 18.70.075(a)(2) (granting the fire department "authority to . . . order a person to leave a building"); see also Conn. Gen. Stat. § 7-313b; Del. Code Ann. tit. 16, § 6701A(2); N.H. Rev. Stat. Ann. § 154:7; Tenn. Code Ann. § 6-21-703; W. Va. Code § 29-3A-1. In contrast, there is no federal statute remotely similar to these state statutes specifically granting the Coast Guard authority to order a ship's master to abandon his vessel. Moreover, unlike state governments, the federal government does not have a general police power -- something that is probably beyond the authority of any branch of the federal government to create extra-constitutionally. See Lottery Case, 188 U.S. 321 (1903).

Third, life-threatening emergencies on land are very different from life-threatening emergencies at sea. Many state statutes grant the state governor or local authorities the power to declare an emergency which would result in a forced evacuation.

-63-

<u>See</u>, <u>e.g.</u>, Alaska Stat. 26.23.020; Fla. Stat. Ann. § 252.38; Me. Rev. Stat. Ann. tit. 37-B, § 742; Minn. Stat. Ann. § 12.21; Or. Rev. Stat. §§ 401.305, 401.309; Tenn. Code Ann. § 58-2-118. On land, it may be presumed that a trained law enforcement official has more knowledge than an average person about an impending emergency, such as a storm or a fire. At sea, however, a captain's expertise regarding his ship places him in the best position to determine the actual peril of his vessel and how best to save it. Coast Guardsmen, unfamiliar with the vessel involved in the emergency, ought not be able to substitute their judgment for that of the master by forcing evacuation upon him. In an emergency situation, it is unwise for the least knowledgeable to command the most knowledgeable.

Fourth, allowing the Coast Guard to dictate to the master how to save his ship interferes with the vital relationship between a master and his vessel. As one expert on the duties of a master has testified, a master "has no umbilical cord of support. He is the sole decision maker and he lives with the responsibility that he's got to discharge, under adverse and varied conditions, calling upon those levels of expertise at moments and when he's least expecting it." <u>In re Exxon Valdez</u>, 1995 WL 527990, at *5 (D. Alaska, Jan. 27, 1995). The exigencies and realities of life at sea require that there be a rigid chain of command aboard a ship. A master's responsibility to his ship is nondelegable and should be

free from officious meddling. Particularly in times of life-threatening emergencies, it is unwise to interfere with the chain of command by forcing the master to succumb to the orders and directions of an intervening governmental bureaucracy, particularly one which ultimately disclaims responsibility for its actions.

## II. Coast Guard interference with the commercial salvor

I agree with the majority that there is sufficient evidence in the record to create a factual issue on the question of whether the Coast Guard's interference with the commercial salvor's communications prevented him from pursuing salvage efforts and using his diving capacity to find and plug the leak. I disagree, however, with the majority's determination that the district court correctly granted summary judgment because plaintiffs failed to establish a factual issue as to whether the Coast Guard was negligent in delaying Goodridge, the commercial salvor, and as to whether the Coast Guard was negligent in assuring Captain Haggerty that it was working on getting outside commercial salvage assistance.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rosenberg v. City of Everett, 328 F.3d 12, 17 (1st Cir. 2003) (citing Fed. R. Civ. P. 56(c)). We review an award of summary judgment de novo,

-65-

construing the record in the light most favorable to the plaintiffs and resolving all reasonable inferences in their favor. Id.

## A. **The reliance argument**

The parties agree that the Good Samaritan doctrine, "which makes one person liable to another for breach of a duty voluntarily assumed by affirmative conduct," applies to this case. Good v. Ohio Edison Co., 149 F.3d 413, 420 (6th Cir. 1998) (internal citations and quotations omitted). Coast Guard liability may be established if the Coast Guard's statements "mislead . . . [or] induce reliance upon a belief that it is providing something which, in fact, it is not providing." Sandra & Dennis Fishing Corp., 372 F.2d at 195.

There are several statements in the record that create a factual issue as to whether the Coast Guard falsely informed Captain Haggerty that they were arranging for commercial assistance when, it is alleged, they were not. Captain Haggerty testified, in a sworn affidavit, that "[b]ecause the Coast Guard had told me that they were working on arranging commercial assistance, I did not make any calls on the radio . . . to call for help." Haggerty also radioed Station Gloucester asking "if there was anybody available, if there was any more pumps." The Coast Guard responded that they were "working on that." Haggerty allegedly relied on the Coast Guard's statements and believed them. In fact, it is claimed that even as he was being forced off the NORTHERN VOYAGER, Haggerty

-66-

reiterated to the Coast Guardsman that he wanted to remain aboard his vessel, to stabilize it and await salvage assistance.

It is admitted that the Coast Guard never arranged for commercial salvage assistance.[29] Nor did they inquire whether anyone was available or whether there were any more pumps.

The majority discounts Haggerty's sworn testimony by concluding that the "natural assumption" is that the Coast Guard's statement that we are "working on that" referred to the impending arrival of the cutter ADAK. It is equally, if not a more "natural assumption," that Haggerty's question asking if anyone was available referred to the availability of commercial salvors, who routinely carry pumps aboard their ships. Most important, this Court must view all facts in favor of the nonmoving party. Any "natural assumptions," therefore, must be viewed in a light most favorable to the plaintiffs. Keeping this in mind, it is clear that there is enough evidence of detrimental reliance to warrant a remand on that issue as well.

B. **The delay argument**

By dissecting the record, the majority drew two

---

[29]Congress has expressed concerns that the Coast Guard -- acting as a private salvor -- may unduly interfere with commercial salvage efforts. Such concerns led Congress, in 1982 legislation, to direct the Coast Guard to "review Coast Guard policies and procedures for towing and salvage of disabled vessels in order to further minimize the possibility of Coast Guard competition or interference with private towing activities or other commercial enterprise." Coast Guard Authorization Act of 1982, Pub. L. No. 97-322 § 113, 96 Stat. 1581 (1982).

conclusions:  first, the Coast Guard delayed Goodridge by, at most, twelve minutes; and second, twelve minutes is not a significant delay.  Both conclusions are wrong.

At 9:03 a.m., Goodridge called Station Gloucester to inform them that he had equipment and was available to assist in the salvage efforts.  The Coast Guard responded that "they were busy and they were going to handle it . . . they didn't need any help."  After being rebuffed by the Coast Guard, Goodridge returned to work and gathered his gear to prepare to salvage a boat that had sunk that morning.  Goodridge continued to listen to his radio transmitting the communications regarding the NORTHERN VOYAGER.  After further listening, Goodridge concluded that, despite what the Coast Guard had said, the NORTHERN VOYAGER would need his help.  Thus, at 9:15 a.m., Goodridge called Cape Ann Divers to inquire who would be there to assist in a dive and to gather information.  At 9:33 a.m. Goodridge called Station Gloucester again and informed them that he was coming with equipment.  At this point, the majority is correct that, at most, the Coast Guard delayed Goodridge by twelve minutes.  But, the Coast Guard caused further delay once Goodridge arrived at his boat.  Using the radio onboard his boat, Goodridge attempted to contact the Coast Guard to ask if "we should take the time to load pumps or just come with the dive gear."  The Coast Guard responded: "don't tie up the channel; we're

busy; don't tie up the channel."[30]  Since the Coast Guard did not respond, Goodridge "took the time" to "run the pumps down the dock."  It is unclear how much extra time this took, but viewing the evidence in a light most favorable to the plaintiffs, it is enough evidence to require a remand on this issue.  This is especially true considering that the repairs required by the NORTHERN VOYAGER would have taken "two minutes or less" to complete[31] and did not even require the use of additional pumps.

Further, even if it is assumed that Goodridge was delayed by only twelve minutes, viewing the evidence in a light most favorable to the plaintiff, it can be concluded that the delay was significant.[32]  Had the delay not occurred, Goodridge could have arrived at the scene in time to communicate with Captain Haggerty.  At such time, further efforts could have been taken to save the NORTHERN VOYAGER.  This issue should also be remanded since the

_____

[30]Goodridge originally radioed the Coast Guard on channel 16 and, as is customary, told the Coast Guard to switch to Channel 22, the channel where the NORTHERN VOYAGER communications were taking place.  After switching to Channel 22, the Coast Guard asked Goodridge to switch to Channel 12.  Upon doing so, Goodridge was told not to "tie up" this non-emergency channel, despite the fact that Channel 12 did not contain any emergency communications between the Coast Guard and the NORTHERN VOYAGER.  Thus, in effect, the Coast Guard silenced and isolated Goodridge's salvage attempts.

[31]The evidence showed that all a diver had to do was plug the rudder shaft, a simple and quick maneuver.

[32]This evidence should also be viewed in light of the fact that the NORTHERN VOYAGER was afloat for about one hour after the master was forced to abandon it and to cease efforts to save it.

delay could have led to the demise of the NORTHERN VOYAGER.

### III. Conclusion

Most respectfully, I strongly disagree with the majority's holding that the Coast Guard has the power to remove a master of a vessel from his ship by threat of force, thereby preventing him from saving it. My views are not some romantic or archaic notion to the effect that the "captain should go down with the ship,"[33] or a claim based on John Stuart Mill-like theories of personal liberty and autonomy,[34] although some might find such arguments appealing. Rather, they are based on the hard realities of the law of the sea as it has existed from time immemorial until this case ensued. The majority's unprecedented holding is not supported by law, practice or maritime tradition. It contradicts legislative enactments and the very purpose of the discretionary function exception. Congress has never granted the Coast Guard the authority to force a master to abandon his vessel. Neither should this Court.

---

[33]Although such a tradition, which has not been altogether fanciful at different times, has served to establish a benchmark for the commitment expected of a ship's captain toward his ship, crew and passengers.

[34]See John Stuart Mill, On Liberty 14 (John Gray ed., Oxford Univ. Press 1991) (1859) ("[T]he sole end for which mankind are warranted, individually or collectively, in interfering with the liberty of action of any of their number, is self-protection [of society] . . . His own good, either physical or moral, is not a sufficient warrant. He cannot rightfully be compelled to do or forbear because it will be better for him to do so . . . Over himself, over his body and mind, the individual is sovereign.")